AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Kimberly Hicks, | ) | Case No. 3 19 71451 JCS |
| | ) | |
| Defendant(s) | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of **October 19, 2017** in the county of **San Francisco** in the **Northern** District of **California**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. § 1320a-7b(b) | Criminal penalties for acts involving Federal health care "Anti-Kickback Statute." |

This criminal complaint is based on these facts:   ~~UNDER SEAL~~

Please see attached affidavit.

☑ Continued on the attached sheet.

Approved as to form:

_/s/_
WILLIAM FRENTZEN
Assistant United States Attorney

_Complainant's signature_

Janette Spring, Special Agent - FBI
_Printed name and title_

Sworn to before me and signed in my presence.

Date: 9/3/19

_Judge's signature_

City and state: San Francisco, California    Hon. Joseph C. Spero, U.S. Chief Magistrate Judge
_Printed name and title_

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Janette Spring, Special Agent with the Federal Bureau of Investigation ("FBI") being first duly sworn, hereby depose and state as follows:

## I. BACKGROUND

### A. INTRODUCTION

1. I submit this affidavit in support of a criminal Complaint for Dr. Kimberly HICKS ("HICKS").

2. There is probable cause to believe HICKS engaged in a scheme to commit Medicare fraud by receiving cash kickback payments in exchange for the referral of patients in violation of 42 U.S.C. § 1320a-7b(b), the anti-kickback statute.

3. As part of this investigation, the Agents have obtained information from the cooperation of an FBI confidential witness ("CW-1")[1] and evidence obtained by an FBI undercover employee ("UCE"):

4. An identified co-conspirator introduced HICKS as a physician willing to accept kickbacks in exchange for patient referrals.

5. During the course of the investigation, UCE had in-person audio and video recorded conversations with HICKS in 2017, in which HICKS received a kickback payment in the form of cash in exchange for the referral of patients.

---

[1] CW-1 has provided information and services to the FBI over approximately two years and has received no monetary compensation or other consideration from the FBI in exchange for the information and services. However, CW-1 was employed by a home health care agency ("HHA Alpha"), which served as a cooperating entity supporting the FBI's undercover operation. As a result of the undercover operation, patient numbers and/or revenue to CW-1 and CW-1's HHA may have increased. These potential increases to CW-1's HHA may have provided benefit to CW-1 by improving his/her standing with the employing HHA. A criminal background check of CW-1 revealed convictions for embezzlement, grand theft, and an arrest for false claim to citizenship. CW-1 is an undocumented immigrant who entered the United States illegally and by presenting false identifying documents to a CBP officer. The CW-1 later falsely denied having possessed false identifying documents when interviewed by immigration officers. Although CW-1 is a removable alien, removal has been deferred under the Convention Against Torture. The CW-1 may have an incentive to curry favor with federal law enforcement because of his immigration status. After the conclusion of this undercover operation, FBI Agents became aware that during the undercover operation but after HHA Alpha was no longer accepting patient referrals from targets of the investigation, CW-1 was believed to have tried to use his/her role as a source to threaten an individual – with whom he/she had a personal dispute – with a law enforcement investigation into the practices of this individual. To my knowledge, those threats were never carried out. CW-1 is not currently the subject of any pending criminal charges.

1

## B. BACKGROUND OF LEGAL FRAMEWORK AND INVESTIGATION

6. Starting in the 1970s, Congress created, amended, and strengthened the "Anti-Kickback Act", currently United State Code, Title 42, Section 1320a-7b(b). The relevant language of the statute is listed below. In essence, the law criminalizes influencing referrals for federally funded health care through payments. The legislative history revealed Congress was deeply concerned the normalization of kickbacks in federally funded health care programs would lead to fraud and an undermining of the quality of patient services since "operators become more concerned with rebates than with care.[2]" FBI Agents began looking into kickbacks in the San Francisco Bay Area, specifically in the fields of home health and hospice. Their investigation arose from concerns of false billing, referrals without patient care in mind, that health care providers would have a willingness to expose their patients to unnecessary treatments and that certain home health agencies ("HHAs") would have a willingness to bill for, but not provide, necessary services. The preliminary investigation into kickbacks occurring in the Bay Area in the fields of home health and hospice revealed that the above concerns were indeed occurring. Some of the most egregious examples uncovered by the investigation included doctors who referred patients to hospice care in exchange for kickbacks while demanding a "longevity" bonus – meaning the doctor would financially benefit the longer a patient remained on hospice. Since hospice is generally meant for palliative care without curative intent, this system could encourage doctors to abandon curative options earlier with potentially life threatening outcomes.[3]

7. An undercover operation was selected as the means of investigating kickbacks. From training and experience, the investigators understood that health care providers and HHAs shrouded their activities in secrecy. Typically, health care providers were given kickbacks in the form of cash payments made in closed door meetings between themselves and HHA representatives. Some used bogus medical directorship/consultant contracts to disguise kickbacks as payments for seemingly legitimate, but actually

---

[2] "Kickbacks Among Medicaid Providers", Senate Report 95-320, 1977.

[3] In fact, throughout the course of the investigation, four of the targets, while negotiating kickback payment amounts, discussed similar "longevity" bonuses. UCE agreed to these bonuses or entertained further discussion to potentially identify any such referrals by proactively identifying at-risk patients. During the course of the investigation, no such longevity bonus referrals were made to the UCO.

2

non-existent, services. Given the expected closed nature of the transactions and the relatively traceless nature of cash payments, traditional documentary and other overt investigative techniques were deemed to be ineffective. An undercover operation ("UCO") was considered as the most efficient and most successful means to gather direct evidence of the payments and the corrupt intent of the kickback payments

8. Around July 2016, two employees of a known Bay Area home health agency ("HHA Alpha") made a complaint to Health and Human Services Office of Inspector General ("HHS-OIG") regarding payments of kickbacks to doctors by other HHAs in the Bay Area. One of the two agreed to serve as a cooperating witness ("CW-1"). CW-1 was paired with an undercover FBI agent ("UCE"), based in San Francisco, who would portray himself/herself as someone representing investors, intent on acquiring HHA Alpha and seeking to expand HHA Alpha's patient population through illegal kickbacks. UCE often communicated with targets in furtherance of the UCO while in San Francisco. The UCO sought to investigate predicated targets and to use predicated targets to refer UCE to other violators who the targets believed to be engaged in similar conduct.

9. In designing the UCO, investigators learned health care providers were weary of potential legal risks that caused them to be unwilling to accept kickbacks from an unknown undercover agent without an introduction from a known member of the industry. Further, the nature and size of the kickbacks were dependent on the types of HHA services required. For example, certain types of insurance and services were reimbursed at a higher rate, which in turn would lead to higher kickbacks. Many health care providers were also quite concerned with patient satisfaction, partially to avoid a disgruntled patient from questioning the corrupt HHA referral. Therefore, the ability to provide specific details about services, accepted insurance plans, and patient satisfaction was critical to both gaining the initial introductions and to allowing the UCO to expand. The involvement of a vetted HHA would facilitate entry of the UCO and allow kickback referrals to be diverted away from predicated HHA companies. Further, the care provided by the vetted HHA could be monitored and reviewed.

10. In keeping with those goals, HHA Alpha effectively served as a cooperating entity through its management and its participation in the UCO. The FBI investigation was partly based upon

analysis of so-called outlier data – data showing abnormal and potentially illegal conduct – among HHAs and doctors as well as through interviews. Based on examination of the data and interviews, HHA Alpha did not fall into the profile of a likely kickback offender. Checks of FBI databases did not reveal HHA Alpha as a prior or current subject of any investigations. Additionally, the FBI consulted with HHS-OIG and determined HHA Alpha was not a prior or current subject of any investigations. From the founding of HHA Alpha in 2009 until the initiation of the UCO, Medicare received two complaints[4], which were later deemed to be unsubstantiated. Additionally, HHA Alpha's owner was aware that CW-1 would be cooperating with an investigation and the patient paperwork and referrals to HHA Alpha during the UCO were required to be brought to the attention of the investigating agency. Patients referred to HHA Alpha by physicians and others receiving payment from FBI through the UCO, (1) were contacted by an employee of HHA Alpha to obtain their consent for treatment by HHA Alpha, (2) as a result of this consent and intake process, some patients ultimately did not receive treatment from HHA Alpha because they declined treatment, preferred an HHA of their own choosing, or medical evaluation determined treatment was inappropriate, (3) HHA Alpha was made aware of patients that were referred through the course of the UCO, and (4) FBI conducted interviews of all available patients referred to HHA Alpha and there were no serious allegations of failure in patient care.[5] During the course of the UCO, there was one complaint regarding patient care provided by HHA Alpha made by a recently hired, and then fired employee, but an investigation by the California Department of Public Health did not result in any negative finding against HHA Alpha. No other complaints about HHA Alpha were reported to Medicare through the duration of the UCO. During the course of the UCO, a total of 27 subjects were paid kickbacks and referred patients to HHA Alpha. At no time during their meetings with CW-1 and/or UCE

---

[4] An anonymous complaint filed in 2016 alleged a durable medical equipment kickback scheme, which was closed due to insufficient information. In 2015, Medicare closed a patient allegation of false billing by HHA Alpha after a review of documents provided by HHA Alpha justified the billing.

[5] Only three patients out of 129 interviewed by FBI complained and the complaints consisted of (1) early discontinuation of treatment, (2) a nurse should have shown up more often, and (3) physical therapy should have been longer. Of all patients referred to HHA Alpha by targets of the investigation during the UCO, the FBI was unable to interview 31 patients due to the patients passing away in hospice care or because the patients could not be located – generally international patients. As to those patients, no complaints regarding patient care were ever filed against HHA Alpha.

did the subjects express any concerns regarding the treatment of their patients by HHA Alpha nor notify that any patient complaints had been received. Further, none of the subjects indicated they were aware of any illicit conduct by HHA Alpha prior to or during the UCO.

### C. AGENT QUALIFICATIONS

11. I am a Special Agent of the FBI and have been so employed for approximately three years. I am currently assigned to the Complex Financial Crime Squad of FBI's San Francisco Field Division. As part of my assigned duties, I investigate possible violations of federal criminal law, specifically investigations involving white collar crime. I have received specialized training in health care fraud matters including, but not limited to, Anti-Kickback, Mail Fraud, Wire Fraud, and False Claims. I have participated in the execution of various arrests and search warrants in which business and personal documents, bank records, computers, and other evidence of fraud and other crimes have been seized.

12. In the course of this investigation and my investigation of other health care fraud schemes, I have (1) interviewed numerous persons; (2) reviewed numerous records and pertinent data; (3) read interviews and other reports written by other law enforcement officers; and (4) become familiar with the manner and means by which health care fraud schemes are operated including violations of 42 U.S.C. Section 1320a-7b and 18 U.S.C. Section 371.

13. This affidavit is intended to show merely that there is sufficient probable cause for the requested Complaint and arrest warrant and does not set forth all of my knowledge about this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Where excerpts of transcripts of audio recorded conversations are presented, they represent my best effort at this time to transcribe such recordings and I believe them to be accurate in substance.

### D. COMPLAINANT

14. Dr. Kimberly HICKS, is a 49 year old physician operating a medical office in Oakland, CA. During the course of the investigation, HICKs accepted kickbacks from an FBI UCE in exchange for patient referrals.

### E. STATUE VIOLATED

15. **Title 42, United States Code, Section 1320a-7b(b)(1)(A)**, in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directory or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

## II. PROBABLE CAUSE

### A. HICKS IS INTRODUCED TO UCE BY A CO-CONSPIRATOR

16. In January 2017, CW-1 identified GLENNDA SANTOS ("SANTOS") as a prominent marketer employed by several HHAs in the area.

17. CW-1 informed agents that SANTOS was participating in a cash-for-patient referral scheme involving physicians, hospital case managers, and employees at skilled nursing facilities throughout the San Francisco Bay Area. In so doing, SANTOS would give envelopes of cash to these individuals in order to direct patient referrals to the HHAs.

18. HICKS was later introduced to UCE by a co-conspirator, Dr. Henry WATSON ("WATSON"), a physician introduced into the scheme by SANTOS.

19. During the course of the UCO, UCE met with WATSON on several occasions. During their recorded meetings, WATSON accepted kickbacks in exchange for patient referrals. WATSON also offered to introduce UCE to other physicians willing to engage in the kickback scheme.

20. During a meeting on June 29, 2017, WATSON identified HICKS as a physician willing to engage in the scheme. WATSON instructed UCE how to approach HICKS and the other physicians, suggesting UCE mention WATSON's name and use "code words". In suggesting the use of "code words", WATSON demonstrated he understood the illicit nature of his relationship with UCE and was attempting to conceal the illicit activity. Below is an excerpt of the aforementioned exchange:

> WATSON: You might use some kind of terms like ah Dr. Watson you know says he works you know worked very closely with you and we've he's sent us some patients ah he understand he was saying that you're very much

6

|  |  |
|---|---|
|  | entrepreneur and in the entrepreneurial spirit of business my time is a really good opportunity. Something like that. |
| UCE: | Sure. |
| WATSON: | You know, you know all the code words. |
| WATSON: | … |
| UCE: | . . . I don't generally say stuff like I've got reasons for you to meet me. |
| WATSON: | Yeah, that's . . . |
| UCE: | Thousands of reason to meet me. |
| WATSON: | Yeah, there there you go. |
| UCE: | (laughs) |
| WATSON: | There you go. That's real cuts right to the chase. |

21. On September 19, 2017, UCE recorded a meeting with WATSON, during which they discussed the UCE's unsuccessful attempts to contact HICKS and the other physicians identified by WATSON. During their meeting, WATSON placed a call to HICKS's medical office. WATSON spoke briefly with HICKS in order to introduce the UCE. Below is an excerpt of the aforementioned exchange:

| WATSON: | Yes uh, good afternoon. Is Dr. Hicks available? |
|---|---|
| UNKNOWN FEMALE: | Who's calling? |
| WATSON: | This is Dr. Watson calling. |
| UNKNOWN FEMALE: | Okay. Is this regarding a patient? |
| WATSON: | Uh, no. Regarding some business. |

22. Eventually a female, believed to be HICKS, answered the phone and WATSON introduced the UCE, stating "I got a [lady/gentleman], [his/her] name is [the UCE], and [s/he], [s/he] does some work with [HHA Alpha], just in terms of helping them develop their business, and I think [s/he], [s/he] might have something that you like, that [s/he] could holler at you about" and "You're gonna, you're gonna be happy with it."

7

23. Immediately following the meeting, UCE sent HICKS a text message stating "This is Ravi, I was with Dr Watson when he called. Do you have any free time midday tomorrow?"

24. From September 19, 2017 until their initial meeting on October 19, 2017, HICKS and UCE exchanged at least 20 text messages arranging the upcoming meeting.

### B. HICKS ACCEPTS KICKBACKS PAYMENTS IN EXCHANGE FOR THE REFERRAL OF MEDICARE PATIENTS

25. During a recorded meeting with HICKS on October 19, 2017, UCE explained his/her involvement the takeover of HHA Alpha and that s/he had adopted "aggressive business practices" [the payment of kickbacks] in order to increase HHA Alpha's patient population. UCE further explained s/he had a "trusting relationship" with WATSON and was relying on WATSON to introduce other physicians interested in a similar arrangement. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | In the meantime we uh, believe that we can adopt some aggressive business practices,... |
| HICKS: | Mhm. |
| UCE: | ...but we need to know trusting relationships with doctors. |
| HICKS: | Mhm. |
| UCE: | Uh, we have one with Dr. Watson,... |
| HICKS: | Mhm. |
| UCE: | ...and I asked him if there were other doctors who would be interested in the same. |
| HICKS: | Yeah. |
| UCE: | He said, he suggested you. Is that something... |
| HICKS: | Oh definitely, definitely. We're on the same page. |

26. During the same meeting, UCE stressed the importance of being careful, indicating there was risk associated with their arrangement. Below is an excerpt of the aforementioned exchange:

8

| | |
|---|---|
| UCE: | 'Cause we like it to be nice and careful. |
| HICKS: | Good. |
| UCE: | The other thing is if at any time you have any doubt about her care, you have any doubt, concerns about uh, you know, envelopes that (UI)... |
| HICKS: | Mhm, mhm, mhm. |
| UCE: | ...have any doubt at all,... |
| HICKS: | Oh, right. |
| UCE: | ...you shake my hand and I'll say thank you and I won't ask, you know... |
| HICKS: | Alright. |

27. HICKS and UCE discussed how many patient referrals could be expected in exchange for the kickback payment. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | Okay. So, usually what we like to do is at the um, at the uh, eight to ten patient level we do about three thousand dollars a month. |
| HICKS: | Okay. Right. |
| UCE: | Does that sound fair? |
| HICKS: | Sounds fair. |
| UCE: | Okay. So uh, if that works for you... |
| HICKS: | It works for me. |

28. At the conclusion of the meeting, UCE set up a group text between HICKS and CW-1 to allow for the discussion of patient referrals. UCE also gave HICKS three envelopes each containing $1,000 cash. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | So each envelope's a thousand dollars. |
| HICKS: | Thank you. |
| UCE: | I appreciate it. |

9

| | |
|---|---|
| HICKS: | I appreciate you. |
| UCE: | And if you have any questions let me know,… |
| HICKS: | Right. |
| UCE: | …and I will send you a text with both of us [CW-1 and the UCE] on there. |
| HICKS: | Thanks. And yes. |

29. On or about November 7, 2017, HICKS left a voicemail on CW-1 cellular telephone advising she had a patient in need of services. Below is an excerpt of the voicemail:

| | |
|---|---|
| HICKS: | Hi [CW-1], this is Kimberly Hicks. I'm, I, you know I forgot the name of your company so would you please give me a call at 5-1-0-5-1-7-8-0-0-5. I have a patient whose mom is in the hospital and she's gonna need home health care um and possibly with you know comfort care transitioning to Hospice. If you would please give me a call at your earliest convenience. 5-1-0-5-1-7-8-0-0-5. Thank you. |

30. In response, CW-1 contacted HICKS' office via telephone on the same date and spoke with an unidentified female who confirmed the patient's paperwork was faxed to the number provided on HHA Alpha's brochure. CW-1 sent a follow-up text message to HICKS thanking her for the referral: "Thank you Dr. Hicks. My nurse is on her way to meet the dtr [daughter] and will call her on her way. Will it be possible to fax me the demographics and H&P for this pt. Pls fax to my attn at [HHA Alpha fax number]. Thx."

31. On or about November 8, 2017, HICKS sent CW-1 a text message, asking "Did you receive fax?" To which CW-1 responded, "Yes thank [you]".

32. A review of the paperwork faxed to HHA Alpha confirmed the patient referred by HICKS was a Medicare beneficiary.

### III. PROBABLE CAUSE FOR THE VIOLATION

    A. **TITLE 42 UNITED STATES CODE, SECTION 1320A-7B(B)(1)(A), THE ANTI-KICK BACK STATUTE**

33. Title 42 United States Code, Section 1320a-7b(b)(1)(A), in relevant part, makes it a crime to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any service for which payment may be made in whole or in part under a Federal health care program.

34. Based on all of the foregoing, probable cause exists to believe that HICKS accepted kickback payments from UCE that were intended to induce HICKS to send patient referrals to HHA Alpha for home health and/or hospice services later billed to Medicare.

35. Medicare is a federally funded health care program, and the referral of patients to HHA Alpha by HICKS for home health and/or hospice services constitutes a referral, as defined by Title 42 United States Code, Section 1320a-7b(b)(1)(A).

36. Therefore, there is probable cause to believe that patient referrals sent to HHA Alpha by HICKS in exchange for cash payments from UCE meets the definition of a kickback payment and violates anti-kickback statute.

## IV. CONCLUSION

37. Based on the foregoing, there is probable cause to believe HICKS conspired to receive kickbacks in exchange for patient referrals, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A).

## V. REQUEST FOR SEALING

38. Since this investigation is ongoing, disclosure of the Complaint, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation. Disclosure could result in the destruction of evidence, intimidation or collusion of witnesses, or the flight of a suspect.

//
//
//
//

Accordingly, I respectfully request the Court issue an order directing this Affidavit and any related documents be sealed until the further order of this Court.

_____
Janette Spring, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this 3rd day of September, 2019.

_____
HON. JOSEPH C. SPERO
United States Chief Magistrate Judge

12